UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

OSCEOLA TRACE DEVELOPMENT
CORPORATION, *et al.*

          Debtor.

                                     /

Case No. 10-48790-PGH
Chapter 11
Jointly Administered

### MOTION OF WELLS FARGO BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTION 362(D)(1) OF THE BANKRUPTCY CODE TO PURSUE DECLARATORY JUDGMENT AS TO NOTE

Wells Fargo Bank, N.A., solely in its capacity as Indenture Trustee (the "Indenture Trustee") for those certain $84,880,000.00 Shingle Creek Community Development District (Osceola County) Capital Improvement Revenue Bonds Series 2006 (the "Bonds"), issued pursuant to that certain Master Trust Indenture dated as of August 1, 2005 (the "Master Trust Indenture"); First Supplemental Trust Indenture dated as of August 1, 2005 (the "First Supplemental Trust Indenture"); and Second Supplemental Trust Indenture dated as of August 1, 2006 (the "Second Supplemental Trust Indenture," and collectively with the Master Trust Indenture and the First Supplemental Trust Indenture, the "Indentures"), by and through its undersigned counsel, hereby submits this Motion for Relief from the Automatic Stay Pursuant to Section 362(d)(1)[1] to Pursue Declaratory Judgment as to Note (the "Motion"). In support of the Motion, the Indenture Trustee respectfully states as follows:

### I.    INTRODUCTION

1.    Through this Motion, the Indenture Trustee seeks limited relief from the automatic stay, to the extent necessary, to litigate in a pending state court action the bona fides of

---

[1]    Unless otherwise indicated, section references are to sections in chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

a purported "replacement" note in the amount of $22,289,677.00 (the "Replacement Note"),[2] which the Debtors allege was made by the Shingle Creek Community Development District ("Shingle Creek") in favor of non-debtor Osceola Development Trust (the "Trust"). Debtor Osceola Development Project, L.P. is the 100% beneficiary of the Trust, and claims a beneficial interest in the alleged Replacement Note. For the reasons noted below, the Indenture Trustee believes that the alleged Replacement Note is a sham, and was concocted to offset bond debt assessment liabilities in excess of $50 million owed by the Trust to Shingle Creek, which Shingle Creek in turn owes to the bondholders represented by the Indenture Trustee. Also for the reasons noted below, the Indenture Trustee believes that the determination as to the bona fides of the purported Replacement Note is best made in the pending state court action, which involves a number of parties not before this Court, including the Trust, the Shingle Creek board, and a number of corporate entities owned or controlled by Robert Miller, the ultimate beneficiary of the Debtors and all other entities associated with Shingle Creek.

      2.     The declaratory judgment count the Indenture Trustee seeks to bring in state court addresses an ongoing effort of one of the landowners within Shingle Creek, Myron Miller, as Trustee of the Trust, and its affiliates, to willfully and fraudulently deny the Indenture Trustee and holders of Bonds their negotiated rights under the Indentures. In particular, the Trust is liable for assessments validly imposed upon it by Shingle Creek – assessments which are reserved for servicing the Bond debt. Although the Trust has long refused to pay such assessments, the board of Shingle Creek recently took unanticipated and improper actions in violation of the Indentures and their fiduciary duties to wrongfully reduce the Trust's liability to Shingle Creek.

---

[2] The alleged note is claimed as an asset on Schedule B of Debtor Osceola Development Project, L.P.

3.    In particular, on November 8, 2010, the Shingle Creek board documented a purported and approximate $22 million liability to the Trust.  The board justified the issuance of such note purportedly as a replacement of an "identical" note issued over five years earlier.  The Indenture Trustee contends, however, that such Replacement Note is nothing more than a fraudulent attempt by the board, the Trust and its affiliates to use such putative debt to reduce or eliminate the Trust's liability for the levied assessments.  As described in detail herein, the Indenture Trustee's contentions are based, in part, upon (i) the fact that the Alleged Liability (as defined herein) reflected in the Replacement Note is not evidenced in any of the contemporaneous documents from such time that should reflect the incurrence of such a debt, and (ii) the existence of such Alleged Liability is based solely upon the distant (but surprisingly detailed) recollections of the son-in-law of Robert Miller, the indirect but sole ultimate beneficiary of the Trust.  Furthermore, Robert Miller (or companies he owns or controls) employs each of the current members of Shingle Creek's board.  The inescapable conclusion is that such purported liability is a sham and a nullity.

4.    As a result thereof, the Indenture Trustee seeks to pursue the Board Action (as defined herein) against Shingle Creek's board, Robert Miller and certain other non-debtors to seek redress for the board's improper conduct in issuing the Replacement Note and to prevent any further improper conduct by the board.  The above-captioned debtors will be named as defendants with respect to only one of the seven contemplated counts.  In particular, the debtors will be defendants to the Indenture Trustee's request for a declaratory judgment that the Replacement Note be declared null and void *ab initio* (the "Declaratory Judgment Count").  Because the debtors appear to claim a beneficiary interest in such Replacement Note, the debtors will be named as parties primarily to effect a final and binding resolution pertaining to the

issuance of the Replacement Note. The Indenture Trustee intends to initiate the Board Action in a pending (but recently stayed) foreclosure proceeding against the Trust in a Florida circuit court. Such state court is already familiar, in part, with (i) many of the parties (including the various inter-related corporate entities) named in the Board Action; (ii) the Trust's claims as to the existence and validity of the replacement note; and (iii) many of the issues pertaining to the Trust's liability for unpaid assessments and total amounts owed to Shingle Creek.

5.      For the reasons described herein, sufficient cause exists for this Court to allow the Indenture Trustee to pursue the Declaratory Judgment Count as to the Debtors. There is little risk that this Court's approval of the Motion will cause any disruption of the administration of these Chapter 11 cases. Indeed, as described herein, all of the material actions and events underlying the contemplated Board Action were committed by non-debtor parties. The debtors' only conceivable involvement in the authorization or issuance of the disputed Replacement Note is through the potential imputation of the conduct of Robert Miller to them. The debtors, however, are merely two of the passive vehicles through which Robert Miller holds interests in Shingle Creek property. Moreover, the interests of judicial economy also warrant relief from the automatic stay. The two-forum litigation that the Indenture Trustee would be forced to pursue in the absence of this Court's approval of the Motion will inevitably lead to a waste of judicial resources and an unnecessary expenditure of time and resources on behalf of the Indenture Trustee. The inefficiency of such potential dual litigation is only exacerbated by the potential for inconsistent application of applicable state law and conflicting rulings and determinations with respect to the same.

6.      To the extent that this Court determines it is inappropriate at this time to allow the Declaratory Judgment Count to proceed before the state court as part of the Board Action, the

Indenture Trustee wishes to notify this Court of its intention to initiate an adversary proceeding in the debtors' Chapter 11 cases addressing the validity of the Replacement Note. Although the state court may be better suited to (i) interpret and apply the State statutes integral to the Declaratory Judgment Count, and (ii) impose and bind its determinations upon all non-debtor parties to the Board Action, the Indenture Trustee seeks the Court's guidance as to how to proceed, and is situated and prepared to act on the Court's directives.

## II.    STATEMENT OF FACTS

### A.    Shingle Creek

7.    On May 23, 2005, the Osceola County Board of Commissioners passed County Ordinance No. 05-15, which created Shingle Creek. Shingle Creek is a local unit of special purpose government organized and existing under the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes (the "Community Development Act").

8.    Pursuant to Section 190.006 of the Community Development Act, Shingle Creek established a five member Board of Supervisors (individually, a "Supervisor", and collectively, the "Board"), which manages the affairs of Shingle Creek.[3] Each Supervisor has affirmative obligations to conduct the affairs of Shingle Creek in accordance with (i) the law generally, (ii) the Uniform Special District Accountability Act of 1989, Chapter 189, Florida Statutes, and (iii) the Community Development Act. As a result, each Supervisor has affirmative obligations to, in part:

- Refrain from causing Shingle Creek to assume liabilities for which Shingle Creek receives no benefit;
- Cause Shingle Creek to honor its contractual commitments;

---

[3]    The five Supervisors are as follows: Willa Anne Fearington, Chairperson of the Board ("Fearington"); Christopher M. Austin, Vice Chairperson of the Board ("Austin"); Arik Basso, Assistant Secretary of the Board ("Basso"); Anthony Bill, Assistant Secretary of the Board ("A.Bill"); and Donna Bill, member of the Board ("D.Bill"). In addition, Daren Rubenfeld ("Rubenfeld") was Chairperson of the Board from Shingle Creek's inception through February 15, 2008.

- Refrain from conducting the affairs of Shingle Creek in a manner harmful to Shingle Creek, its creditors, and the Indenture Trustee; and
- Fully and fairly disclose to the Board all material facts which pose an actual or potential conflict of interest relating to any aspect of the Shingle Creek business (collectively, the "Obligations").

*See generally,* FLA. STAT. ANN. § 189.402 (2011); FLA STAT. ANN. § 190.002(1)(b) (2011); FLA. STAT. ANN. § 190.016(11) (2011).

9.      Each of the Supervisors is currently employed by Legacy Acquisitions I, LLC d/b/a Main Street ("Main Street"), a developer of real estate within and in proximity to Shingle Creek.    At all relevant times, Main Street was owned and controlled by Robert Miller. Fearington is Main Street's General Counsel.    Austin is Main Street's Vice President.    Basso, A.Bill and D.Bill are each Main Street employees.    Robert Miller is the President and Chief Executive Officer of Main Street.

10.      The Trust is a developer, and the owner, of most of the land within Shingle Creek. The Trust is governed under the provisions of Chapter 689, Florida Statutes.    Myron Miller, Robert Miller's son, serves as the trustee of the Trust.    In addition, Rubenfeld, Robert Miller's son-in-law and a former Chairperson of the Board and employee of Main Street, currently serves as counsel to the Trust.    Osceola Development Project, L.P. ("Osceola Development"), a limited partnership controlled by Robert Miller, is the sole beneficiary of the Trust.    Robert Miller is a 50% limited partner in Osceola Development.    Osceola Trace Development Corporation ("Osceola Trace"), a corporation wholly owned by Robert Miller, is a 45% limited partner and a 5% general partner in Osceola Development.

11.      On November 9, 2005, the Trust sold approximately 80 acres of land in Shingle Creek to Osceola Trace, LLC ("Trace").    Trace is a limited liability company 50% owned by Osceola Trace Venture II, LLC, a limited liability company wholly owned by Robert Miller.

12.    In addition, between May 2004 and July 2006, the Trust sold 42 acres of land, and contracted to sell an additional 57 acres of land, in Shingle Creek to Osceola Parkway Venture I, LLC ("Parkway Venture", and collectively with the Trust and Trace, the "Landowners"). Parkway Venture is a limited liability company 50% owned by Osceola Trace Venture I, Inc., a corporation wholly owned by Robert Miller.

13.    A chart diagramming the entangled relationships of Robert Miller's holdings (the "Corporate Chart") is set forth on the following page:


- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

# CORPORATE CHART



**B.    The Indentures and the Assessments**

14.    On August 1, 2005, Shingle Creek and U.S. Bank National Association ("U.S. Bank")[4] executed the Master Trust Indenture and the First Supplemental Trust Indenture.[5]  Under the Community Development Act, the obligations and commitments of the Board set forth in the Indentures constitute "valid and legally binding" obligations of Shingle Creek.

15.    On the same day, the Board adopted a resolution approving an offering statement (the "Offering Statement") for certain Capital Improvement Bond Anticipation Notes (the "Anticipation Notes").  The purpose of the Offering Statement was to fully and fairly disclose all material facts concerning the Anticipation Notes to potential investors.  The Offering Statement provided, in part, that the Board would use proceeds from the Anticipation Notes to acquire certain wetlands and conservation areas within Shingle Creek (the "Common Area Property").

16.    On August 10, 2005, pursuant to the terms of the Master Trust Indenture and the First Supplemental Trust Indenture, and consistent with the Offering Statement, Shingle Creek issued the Anticipation Notes.  On the same day, Shingle Creek used approximately $22 million of the proceeds from the issuance of such notes to purchase the Common Area Property from Osceola Development.  In connection therewith, Shingle Creek and Osceola Development entered into the Agreement Regarding the Acquisition of Certain Work Product and Real Property (the "Acquisition Agreement").  The Acquisition Agreement provides that it "constitutes the final and complete expression of the agreement between the parties relating to the subject matter" of the acquisition.

17.    Upon payment to Osceola Development, the Trust (not Osceola Development) conveyed the Common Area Property to Shingle Creek by warranty deed.  Rubenfeld, the

---

[4]    Wells Fargo Bank, N.A. is the successor to U.S. Bank, which served as indenture trustee until August 2010.
[5]    The Master Trust Indenture and the First Supplemental Trust Indenture are attached hereto as Exhibit A and Exhibit B, respectively.

Chairperson of the Board at the time, signed the warranty deed on behalf of the Trust to himself on behalf of Shingle Creek. At all times since August 10, 2005, Shingle Creek has owned fee title to the Common Area Property. Indeed, Shingle Creek's annual audited financial statements from 2005 through 2009 (the "Financial Statements") each show that Shingle Creek holds the Common Area Property at a value of $22,315,159.00.

18. On August 1, 2006, Shingle Creek and the Indenture Trustee executed the Second Supplemental Trust Indenture,[6] pursuant to which Shingle Creek issued the Bonds in the amount of $84,880,000.00. The Bonds were used, in part, to retire the Anticipation Notes and cover the cost of the acquisition and construction of infrastructure on the Common Area Property.

19. The Community Development Act permits Shingle Creek to impose assessments on all lands within the boundaries of Shingle Creek for debt service payments on the Bonds. Under the Master Trust Indenture, Shingle Creek granted a "first lien" on all assessment revenues in favor of holders of the Bonds "superior to all other liens now existing or hereafter created." *See* Master Trust Indenture § 701(d). A lien was also created in favor of the Indenture Trustee on bond sale proceeds for the payment of the Bonds and the special assessments, among other things, as against all parties having claims of any kind against the Indenture Trustee or Shingle Creek. *See Id.* at § 501. The Master Trust Indenture provides that such lien is "prior and superior to all other liens now existing or hereafter created." *Id.* Under the Master Trust Indenture, Shingle Creek further agreed to: (i) levy and collect assessments in an amount sufficient to repay the Bonds; (ii) foreclose on delinquent assessments; (iii) protect the lien created by the Master Trust Indenture against all other claims or demands; and (iv) refrain from issuing any obligations payable from the proceeds of assessments, aside from the obligation to repay the Bonds. *See Id.* at § 701(d).

---

[6]    The Second Supplemental Trust Indenture is attached hereto as <u>Exhibit C</u>.

20.    On June 19, 2006, and July 19, 2006, the Board adopted resolutions authorizing the imposition of assessments on the Landowners' property within Shingle Creek.  On August 1, 2006, each of the Landowners executed a "Declaration of Consent to the Jurisdiction of the Community Development District and to Imposition of Special Assessments" (the "Declaration") in which they  agreed to the levying of assessments and acknowledged the validity of liens on their Shingle Creek properties with respect thereto.[7]

## C.    The Foreclosure Action

21.    As agreed to in the Declaration, Shingle Creek imposed assessments upon each of the Landowners.  Yet, to date, none of the assessments have been paid.  In particular, Shingle Creek is owed assessments in the amount of (i) $50,289,059.00 from the Trust, (ii) $19,989,950.11 from Trace, and (iii) $12,370,990.73 from Parkway Venture.  *See* Corporate Chart.

22.    On November 20, 2009, in an effort to collect the unpaid assessments, Shingle Creek initiated a foreclosure action (the "Foreclosure Action")[8] against, in part, the Landowners in the Circuit Court for the Ninth Judicial Circuit in and for Osceola County, Florida (the "State Court").  Osceola Development, as the sole beneficiary of the Trust, was also named as a defendant.  U.S. Bank was named in the Foreclosure Action in its capacity as a mortgagee and was subsequently granted leave to intervene as a counterclaim defendant in its capacity as indenture trustee.

23.    To date, Shingle Creek has been unable to collect the assessments validly levied on the Trust, Trace, or Parkway Venture, and, without such revenue,  has been unable to satisfy its debt service obligations on the Bonds under the Master Trust Indenture.

---

[7]    The Declaration is attached hereto as Exhibit D.
[8]    A copy of the complaint in the Foreclosure Action (without exhibits) is attached hereto as Exhibit E.  If necessary or required, the exhibits to such complaint are available on request.

## D.    Replacement Note

24.    In the Foreclosure Action, the Trust asserted that Shingle Creek owed the Trust approximately $22.3 million (the "Alleged Liability").  In particular, the Trust alleges that Shingle Creek agreed to pay approximately $44.3 million for the Common Area Property, and not just the cash payment of $22 million that Shingle Creek made to Osceola Development from the proceeds of the Anticipation Notes in 2005.

25.    The Trust contends that the Alleged Liability was supposedly documented by a promissory note issued at the time of the 2005 sale of the Common Area Property.  No copy of the alleged note memorializing the Alleged Liability has ever been found.  In an affidavit dated November 8, 2010 (the "Rubenfeld Affidavit"), Rubenfeld (Robert Miller's son-in-law) attests that the original note evidencing the Alleged Liability was lost.  The creation or the existence of the Alleged Liability, however, is not reflected in the documents issued at the time of the sale of the Common Area Property.  Specifically,

- No resolutions passed by the Board reflect the authorization for the execution of a note imposing the Alleged Liability;

- No minutes of Board meetings reflect discussion of the Alleged Liability;

- Not one of Shingle Creek's Financial Statements from 2005 to 2009 reflect the Alleged Liability.  Indeed, the failure to include such a liability in the Financial Statements with an intent to deceive would make the Financial Statements materially misleading and constitute a third degree felony under Section 817.2341 of the Florida Statutes;

- Neither the Master Trust Indenture nor the First Supplemental Trust Indenture reference any intention on the part of Shingle Creek to finance the purchase of the Common Area Property by incurring the Alleged Liability; and

- The Offering Statement contains no reference to a purchase price of $44 million or any intention by Shingle Creek to finance a portion of the purchase of the Common Area Property by incurring the Alleged Liability.

26.     On November 8, 2010, the Supervisors authorized the execution and issuance of the Replacement Note memorializing the Alleged Liability.  In particular, the Replacement Note obligates Shingle Creek to pay the Trust an additional $22,289,677.00, purportedly as remaining additional unpaid consideration for the Common Area Property.  In authorizing the issuance of the Replacement Note, the Supervisors, on information and belief, relied on the Rubenfeld Affidavit in which Rubenfeld attests to the existence and terms of the original note and claims the Replacement Note is "substantially identical" to the original note.  As a result, the three-page Replacement Note contains numerous terms, conditions, figures and dates which Rubenfeld purportedly remembered from over five years ago.

27.     Under its terms, Shingle Creek is in default of the Replacement Note in the event Shingle Creek fails to complete certain improvements to the Common Area Property.  In the Foreclosure Action, the Trust claims that Shingle Creek has failed in its obligation to make such improvements.  As a result, the Replacement Note was in default at the moment the Supervisors issued it.  Moreover, under the Replacement Note's terms, the Trust is able to accelerate principal and interest payments upon default.  Thus, the Trust claims in the Foreclosure Action that it is now entitled to immediate repayment of all principal and interest under the Replacement Note.

**E.     The Chapter 11 Cases**

28.     On December 23, 2010, Osceola Development and Osceola Trace (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

29.     The Debtors are not currently engaged in any business activity and report no income from business operations.[9]  The Debtors have no employees.[10]  Indeed, Osceola

---

[9]      *See* Osceola Trace Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48790, D.E. 1 and 27; Osceola Development Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48806, D.E. 1

Development's operating report for December 2010 reveals expenditures of less than $100.00 during the applicable reporting period. *See* Osceola Development Monthly Operating Report, Case No. 10-48806, D.E. 14.

30.     As set forth in its schedules of assets and liabilities, the primary asset held by Osceola Development is its beneficial interest in the Trust, through which it claims to have "beneficial ownership" over several parcels of real estate and an interest in the Replacement Note. *See* Osceola Development Schedule A, Case No. 10-48806, D.E. 1. Both Debtors possess a commercial general liability insurance policy with Scottsdale Insurance Company with a maximum coverage of $2 million. *See* Osceola Trace Schedule B, Case No. 10-48790, D.E. 1; Osceola Development Schedule B, Case No. 10-48806, D.E. 1.

31.     In light of the above-captioned proceedings, Osceola Development filed a Suggestion of Bankruptcy in the Foreclosure Action. As a result, the Foreclosure Action has been stayed.

**F.     The Proposed State Court Action**

32.     In the Foreclosure Action, the Indenture Trustee seeks to bring various counterclaims (the "Counterclaims") against certain non-debtor persons and entities, including the Supervisors, Myron Miller (individually, and as trustee to the Trust), Robert Miller, Rubenfeld, and Shingle Creek (collectively, the "Defendants"), with respect to the authorization and issuance of the Replacement Note (the "Board Action").[11] In addition, the Indenture Trustee seeks by way of this Motion to also include in the Board Action the Declaratory Judgment Count, which seeks mere declaratory relief as to the bona fides of the Replacement Note, as

---

and 14. "D.E." refers to the docket entry number assigned to the relevant filings in the Debtors' chapter 11 cases cited in this Motion.

[10]     *See* Osceola Trace Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48790, D.E. 1 and 27; Osceola Development Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48806, D.E. 1 and 14.

[11]     The proposed Counterclaims are attached hereto as <u>Exhibit F</u>.

against the Debtors as well as the other Defendants. The Indenture Trustee intends to file the Counterclaims as a pleading in the Foreclosure Action with the State Court.

33.    In the Counterclaims, the Indenture Trustee alleges that the issuance of the Replacement Note is nothing more than a wrongful attempt by Robert Miller, the Supervisors, Shingle Creek, and Rubenfeld to reduce the Trust's liability for the assessments levied against it by Shingle Creek. (Compl. ¶ 85.) Such a reduction is accomplished by either (i) forcing the Indenture Trustee to pay funds it holds as Indenture Trustee to the Trust as per the Replacement Note or (ii) treating the Replacement Note as a set-off against the Trust's liability for assessments. (Compl. ¶ 85.) Such a set-off improperly reduces the funds available to the Indenture Trustee to pay the holders of the Bonds. (Compl. ¶ 85.)

34.    In coordinating the issuance of the Replacement Note, the Indenture Trustee alleges, in part, that Robert Miller, the Supervisors, Shingle Creek, and Rubenfeld acted (i) maliciously, (ii) with willful and wanton disregard for the Indenture Trustee's liens, (iii) with the specific intention of causing financial harm to the Indenture Trustee and the holders of the Bonds, (iv) with the specific intention of furthering the financial interests of the Trust at the expense of the Indenture Trustee and the holders of the Bonds, and (v) contrary to the public interest. (Compl. ¶ 86.)

35.    Based on the events described herein and in the Counterclaims, the Counterclaims assert the following six counts against the Defendants (none of which name or involve the Debtors):

- Civil conspiracy against Robert Miller, Myron Miller (individually and as Trustee of the Trust), Rubenfeld, and the Supervisors for entering into an agreement to mitigate the Trust's liability for the assessments by causing Shingle Creek to unlawfully issue the Replacement Note, obligate Shingle Creek with respect to the Replacement Note, and grant such obligation a

lien superior to the Indenture Trustee's lien established in the Master Trust Indenture;

- Violations of Section 517.301(1)(c)[12] of the Florida Statutes by Myron Miller, Shingle Creek, Robert Miller, the Supervisors, and Rubenfeld;

- Breach of the Obligations against the Supervisors with respect to the Supervisors' conduct in authorizing and issuing the Replacement Note;

- Aiding and abetting the Supervisors' breach of the Obligations against Robert Miller, Myron Miller, and Rubenfeld;

- Breach of contract against Shingle Creek and the Supervisors for obligating Shingle Creek to pay funds to the Trust which were not due and owing, and granting such obligation a lien superior to the Indenture Trustee's lien, both actions a breach of the Master Trust Indenture; and

- Tortious interference with contract against Robert Miller, Myron Miller (individually and as Trustee of the Trust), Rubenfeld, and the Supervisors as a result of such parties' complicity in issuing the Replacement Note, which each knew would create a lien in favor of the Trust superior to the lien established in the Master Trust Indenture in favor of the Indenture Trustee.

In addition, by way of this Motion, the Indenture Trustee seeks to add to the Counterclaims the Declaratory Judgment Count, which names the Debtors as well as the other non-debtor Defendants, as follows:

- Declaratory judgment against Shingle Creek, the Trust (by and through its Trustee, Myron Miller), and the Debtors that (i) the Replacement Note is void *ab initio* and (ii) the Indenture Trustee possesses a lien on all Bond sales proceeds and all assessments that are prior and superior to all other liens now existing or hereafter created, notwithstanding the Replacement Note.

### III.    BASIS FOR REQUESTED RELIEF

---

[12]     Section 517.301(1)(c) of the Florida Statutes provides that it is unlawful to,

> "[K]nowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious or fraudulent statement or entry."

*See* FLA. STAT. ANN. § 517.301(c) (2011).

36.     The Indenture Trustee respectfully requests that this Court enter an order modifying the automatic stay in the above captioned proceedings to the extent necessary to permit the Indenture Trustee to file and pursue the Declaratory Judgment Count as part of the Board Action against the Debtors.

37.     Section 362 provides, in relevant part, that:

> (d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1)     for cause, including the lack of adequate protection of an interest in property of such party in interest.

38.     "Cause" is not defined in the Bankruptcy Code. *In re Aloisi*, 261 B.R. 504, 508 (Bankr. M.D. Fla. 2001). Thus, courts must determine "cause" by examining the totality of the circumstances in each particular case. *In re Mack*, 347 B.R. 911, 915-16 (Bankr. M.D. Fla. 2006); *In re Aloisi*, 261 B.R. at 508. As described by the *Aloisi* court, courts in the Eleventh Circuit evaluate the totality of the circumstances by employing a balancing test which includes the following factors:

> (i) whether the prejudice to the debtor and the debtor's estate of modifying the stay is greater than the hardship to the moving party in the event the stay remains in effect;
>
> (ii) whether modifying the stay to permit litigation in another forum would lead to a more efficient use of judicial resources; and
>
> (iii) whether a creditor has a probability of success on the merits of the case.[13]

---

[13]     Courts in the Eleventh Circuit have applied variants of this test. *See, e.g., Beane v. United States (In re Beane)*, 404 B.R. 942, 948 (M.D. Fla. 2008) (bankruptcy courts examine a number of factors, all of which may not be relevant to the facts and circumstances of a particular case, including the following:

> (1) whether relief would result in partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5) whether the debtor's insurer has assumed full responsibility for defending it;

*See Id.* An application of the balancing test to the facts before this Court demonstrates that sufficient cause exists to allow the Declaratory Judgment Count to be pursued by the Indenture Trustee in the State Court as part of the Board Action.

## A.     The Hardship to the Indenture Trustee Outweighs any Potential Prejudice to the Debtors

39.     Under the first prong of the balancing test, courts weigh the potential hardship to the moving party if the stay is not lifted against the potential prejudice to the debtor and its estate if the stay is lifted.  Various hardships to the movant have been found to constitute "cause", including "any reason whereby a creditor is receiving less than his bargain from a debtor and is without remedy" because of the bankruptcy case.  *See Martens v. Countrywide Home Loans (In re Martens)*, 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005).  "Cause" has also been found where a movant would otherwise be required to litigate in multiple courts because the underlying litigation named additional non-debtor parties.  *See In re Davis*, 91 B.R. 470, 472 (Bankr. N.D. Ill. 1988); *In re Peralta Foods Corp.*, No. 07-16508, 2008 Bankr. LEXIS 173, at * 7-8 (Bankr. S.D. Fla. Jan. 18, 2008) ("cause" for modifying the stay existed "principally because of the risks, if the stay is not lifted, of inconsistent results in two forums, of a conflict in the interpretation of

---

(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms).

*See also Karp v. R.J. Groover Constr., LLC (In re R.J. Groover Constr., LLC)*, 411 B.R. 460, 464 (Bankr. S.D. Ga. 2008) (acknowledging that the following 3-pronged variant of the balancing test encapsulates the twelve factors referenced above: (1) whether any great prejudice to either the bankruptcy estate or the debtor will result from prosecution of the lawsuit; (2) whether the hardship to the non-debtor party by continuation of the automatic stay considerably outweighs the hardship to the debtor; and (3) whether the creditor has a probability of success on the merits).  Although the Motion applies the balancing test articulated in *Aloisi*, the facts of the instant case also satisfy the variations of such balancing test articulated by other courts.

state law between the [bankruptcy] court and the [state] court," and of duplication, in part, of lawyer effort).

40.    In asssessing the potential prejudice to the debtor, courts are cognizant of the cost to the estate of defending against the litigation in question and the impact such litigation has on the ability of the debtor to administer the estate. *See In re R.J. Groover Constr., LLC*, 411 B.R. at 465 (lifting the automatic stay, in part, where the debtors' estate would not incur any cost in defending against state court litigation since the debtors' general liability insurer assumed the defense); *In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992) ("cause" exists, in part, where the impact of trial preparation on the administration of the estate would be minimal). Moreover, "cause" has been found where the movant seeks only declaratory relief against the debtor. *See, e.g., Int'l Bus. Mach. v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731, 736 (7th Cir. 1991) (modifying the stay, in part, where the "debtor-defendants [would] suffer little prejudice" since the movant sought only a declaration of liability as a predicate for collection from the debtor's insurer).

41.    "Cause" has also been found where non-debtor defendants facing similar, if not identical, claims are able to shoulder the burdens of the defense of such claims. *See In re Tricare Rehab. Sys., Inc.*, 181 B.R. 569, 577 (Bankr. N.D. Ala. 1994) (the debtor would not be prejudiced by stay modification since the debtor enjoyed "a golden opportunity...to ride the coattails of highly motivated (by the specters of personal liability and exemplary damages)" co-defendants); *see also In re Coachworks Holdings, Inc.*, 418 B.R. 490, 496 (Bankr. M.D. Fla. 2009) (modifying the stay where, in part, (i) multiple non-debtor defendants were named with the debtor in the underlying litigation and (ii) the cases against such defendants revolved "around similar – if not identical – issues and evidence").

**1. Significant Hardship Incurred by the Indenture Trustee**

42.     The Indenture Trustee and the holders of the Bonds will continue to endure significant hardship if the automatic stay is not modified to allow the pursuit of the Declaratory Judgment Count.

43.     The Indenture Trustee and the holders of the Bonds are currently not receiving their bargained for rights under the Indentures.  Moreover, the Indenture Trustee is prevented from seeking a complete remedy for the Supervisors' improper conduct because of the automatic stay imposed by these Chapter 11 cases.  Indeed, the Indenture Trustee has no assurance that the Supervisors will not continue to act in an unauthorized manner under the cover of the automatic stay, which would further impede or mitigate the rights of the Indenture Trustee and holders of the Bonds under the Indentures, and expose them to further harm.

44.     In particular, Shingle Creek, pursuant to the Master Trust Indenture, granted the Indenture Trustee a lien superior to all other liens on Bond sale proceeds.  *See* Master Trust Indenture § 501.  Shingle Creek also granted a "first lien" on all assessment revenues in favor of holders of the Bonds "superior to all other liens now existing or hereafter created." *See Id.* at § 701(d).  Accordingly, the Indentures bestow a clear legal right upon the Indenture Trustee to any and all such revenues from Shingle Creek.  Shingle Creek also avowed to (i) protect the liens created by the Master Trust Indenture against all other claims or demands and (ii) refrain from issuing obligations payable from the proceeds of assessments, aside from the obligation to repay the Bonds. *Id.*

45.     The Board's fraudulent authorization and issuance of the Replacement Note is an attempt to undermine the Indenture Trustee's clear legal and bargained-for rights to assessment revenue.  Through such issuance, the Board and others seek to improperly limit the Trust's liability for the assessments.  In the event of a default by Shingle Creek, the Replacement Note

purportedly grants the Trust a right to immediate repayment of all principal and interest on the Replacement Note. Despite the clear terms of the Indentures, the Trust's rights under the Replacement Note purport to be superior to the rights of the Indenture Trustee with respect to unpaid assessments or proceeds from any foreclosure sale related thereto. Not surprisingly, Robert Miller and the Trust claim an event of default under the Replacement Note and assert counterclaims and cross claims in the Foreclosure Action seeking immediate repayment of all principal and interest due on the Replacement Note.

46.    Thus, an imminent danger exists that the Trust will present the Replacement Note to Shingle Creek for immediate repayment and that the Board (all employees of Robert Miller) consents to such request. Such an action (or any additional reckless behavior on behalf of the Board) diminishes the Indenture Trustee's bargained-for ability to collect assessments or other proceeds to service the Bond debt pursuant to, in part, Sections 501 and 701 of the Master Trust Indenture.

### 2. Minimal Prejudice to Debtors

47.    In contrast, allowing the Indenture Trustee to pursue the Declaratory Judgment Count in the State Court as part of the Board Action has minimal, if any, impact upon the Debtors' ability to administer their estates or bankruptcy cases. As set forth in the Counterclaims, the Debtors are only contemplated as Defendants with respect to the Indenture Trustee's Declaratory Judgment Count, which merely seeks a declaration that the purported Replacement Note is null and void *ab initio*. Because the Debtors apparently claim a beneficial interest in such controversial note, the Indenture Trustee is compelled to name the Debtors to effect a final and binding resolution as to the validity of such Replacement Note.

48.     As the Debtors, however, are mere passive corporate vehicles through which Robert Miller maintains his real estate interests in Shingle Creek, the Debtors play a minimal, if any, role with respect to the events at issue in the Board Action.  Indeed, it is the actions of the Board, the Trust (through Myron Miller), and Robert Miller that are at issue.  As a result thereof, it is doubtful that the Debtors will be required to commit substantial time or resources to discovery (such as producing responsive documents, preparing or defending its employee witnesses, and drafting discovery responses) as the Debtors simply have no first-hand knowledge impacting the validity of the Replacement Note.  Thus, the Debtors will incur little, if any, of the burdens of discovery and trial with respect to the Declaratory Judgment Count.

49.     The pursuit of the Declaratory Judgment Count will also not interfere with the day-to-day business operations of the Debtors.  The Debtors have no business activity to disrupt.  The Debtors are not currently engaged in any business activity and report no income from business operations.[14]  Moreover, as the Debtors have no employees, there is no risk that such employees will become entangled in the Declaratory Judgment Count or otherwise distracted from the administration of these Chapter 11 cases.  It is also unlikely that Debtors' bankruptcy counsel will be required to participate in any way in the Declaratory Judgment Count, such that the administration of these Chapter 11 cases would be adversely impacted.

50.     In addition, although the Debtors assert a beneficial interest in the proceeds of the Replacement Note, other defendants in the Board Action have an identical and more direct stake in defending the validity of the Replacement Note.  It is reasonable to assume that the Board is highly motivated to defend its actions in issuing the Replacement Note, and, as a consequence thereof, the validity of such note.  Likewise, as it is the Trust and Rubenfeld that proclaim the

---

[14]     *See* Osceola Trace Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48790, D.E. 1 and 27; Osceola Development Statement of Fin. Affairs and Monthly Operating Report, Case No. 10-48806, D.E. 1 and 14.

existence of the Alleged Liability, these parties also have a direct stake in demonstrating that the Alleged Liability is a legitimate obligation of Shingle Creek. Indeed, the Trust, through Myron Miller, has already demonstrated the willingness and ability to defend the integrity of the Replacement Note in the Foreclosure Action. There is no reason to suspect that the Trust will act any less vigorously in defending against the Declaratory Judgment Count in light of the financial boon the Trust will receive if the Replacement Note is found to be a legitimate obligation of Shingle Creek.

51.    Finally, as Robert Miller possesses the ultimate responsibility to pay the majority of the contested assessments, he is also extremely motivated to defend against the effort to nullify the Replacement Note. If given force and effect, the Replacement Note dramatically reduces the Trust's liability to Shingle Creek and thereby enhances the value of Robert Miller's holdings.

52.    Furthermore, if the State Court finds the Alleged Liability and the Replacement Note to be invalid and unlawful based on the actions of the non-debtor parties, severe sanctions could be levied against the non-debtor Defendants. Such possible sanctions include, but are not limited to:

- a permanent injunction enjoining the enforcement or payment on the Replacement Note;
- a temporary injunction enjoining the Supervisors from acting by, for, or on behalf of Shingle Creek;
- the disgorgement of any funds which may have been paid under the terms of the Replacement Note;
- damages for breach of the Obligations and breach of contract with respect to Shingle Creek's failure to perform under the Indentures;
- the immediate collection of assessment and foreclosure revenues;
- the possibility of punitive damages in light of the egregious conduct displayed in the creation of the Alleged Liability and authorization of the Replacement Note; and

- potential liability for a third degree felony to the extent the Board intentionally omitted liabilities of Shingle Creek from the Financial Statements.

Thus, to avoid the possibility of severe sanction, the non-debtor Defendants have great incentive to mount a vigorous defense to the Declaratory Judgment Count. As such, there is no reason why the Debtors' beneficial interest in the Replacement Note will not be adequately defended in the State Court by the highly motivated non-debtor Defendants.

53.    Lastly, the Indenture Trustee seeks only declaratory relief, and no other damages, against the Debtors in the proposed Board Action. The Indenture Trustee merely seeks to clarify the parties' rights with respect to the Indentures and the Replacement Note. Such a judgment serves as a predicate for the Indenture Trustee to protect its bargained-for rights under the Indentures with respect to the actions (and potential actions) of the non-debtor Defendants (particularly the Board and the Trust).

54.    In conclusion, the Indenture Trustee readily satisfies the first prong of the "cause" balancing test. The hardship the Indenture Trustee and the holders of the Bonds will endure if the automatic stay is not modified significantly outweighs any prejudice to the Debtors and the Debtors' estate.

**B.    Considerations of Judicial Economy Weigh in Favor of Allowing the State Court to Adjudicate the Board Action**

55.    Under the second prong of the balancing test, bankruptcy courts must determine whether permitting litigation to proceed in another forum would lead to a more efficient use of judicial resources. Judicial economy has been found to warrant relief from the automatic stay in part where (i) issues related to the non-bankruptcy court litigation are complex, (ii) the non-bankruptcy forum is already familiar with such issues, and (iii) the location of many of the parties and documents related to the underlying litigation are near the non-bankruptcy forum.

*See In re Beane*, 404 B.R. at 949; *In re Mack*, 347 B.R. at 915-16.  Modification of the stay is also warranted when permitting the non-bankruptcy forum to preside over the dispute avoids duplication and waste of judicial resources.  *See In re Coachworks Holdings, Inc.*, 418 B.R. at 494 (modifying the stay, in part, because denial of such relief would have led to duplicitous litigation and a risk of inconsistent results, since the underlying cause of action against the debtor and non-debtor parties revolved around the same facts); *In re Davis*, 91 B.R. at 472 (modifying the stay, in part, because non-debtor defendants who faced substantially similar claims as the debtor were not subject to the debtor's bankruptcy proceeding, and, thus, absent relief from the stay, substantially similar issues would have to be tried in two separate forums).

56.     In the instant case, judicial economy dictates that the Declaratory Judgment Count be commenced in the State Court along with the rest of the Board Action (i) because the issues implicated by the Declaratory Judgment Count relate to complex facts of which the State Court is already aware, (ii) because many of the parties and documents in dispute are located near the State Court, and (iii) to avoid duplicative litigation and the waste of judicial resources.

57.     The Declaratory Judgment Count arises predominantly from complex facts already before the State Court in the Foreclosure Action.  These disputed issues include, without limitation, the extent of the Trust's liability for unpaid assessments to Shingle Creek and the total purchase price for the Common Area Property in 2005.  Indeed, the Trust first claimed the existence of the Replacement Note in the Foreclosure Action.  The State Court, through the Foreclosure Action, is also familiar with many of the parties named in the Declaratory Judgment Count, including the inter-related corporate entities Robert Miller has created in furtherance of his real estate development transactions.  *See* Corporate Chart.

58.    In addition, many of the parties and all of the documents related to the Declaratory Judgment Count, as well as the underlying Shingle Creek properties, are located within or near the counties served by the State Court.  In particular, Basso, A.Bill, D.Bill, and Shingle Creek are located within or near Orange and Osceola Counties.  Further, documents related to the Declaratory Judgment Count, including the deeds related to land within Shingle Creek and records related to the Board's activities, are all held by Shingle Creek's District Manager, Fishkind & Associates, Inc., in Orlando, Florida, an area served by the State Court.

59.    Lastly, the non-debtor Defendants have not consented to this Court's jurisdiction. It is questionable at best as to whether this Court's purview extends to all such parties, even if this Court were inclined to adjudicate the Declaratory Judgment Count.  Thus, if this Court does not approve the Motion, the Indenture Trustee could be forced to initiate the Declaratory Judgment Count in this Court as to the Debtors, while contemporaneously pursuing the Board Action against the other Defendants in the State Court.  Such two-forum litigation will inflict further harm upon the Indenture Trustee, as the Indenture Trustee will be forced to unnecessarily duplicate its effort and the costs of litigation.

60.    Such two-forum litigation inevitably leads to a waste of judicial resources.  In particular, this Court would be required to hear substantially similar recitations of complex facts regarding the same parties and the same allegations as those being adjudicated in the State Court. Indeed, such dual litigation creates an odd and conflicting dynamic in which the State Court passes judgment on the Supervisors' actions in issuing the Replacement Note, while at the same time this Court is most likely tasked with determining the validity of the Replacement Note itself.  The inefficiency of such dual litigation is only exacerbated by the potential for (i)

inconsistent interpretations of applicable law, and (ii) different rulings and determinations with respect to the same.

61.    As a result thereof, judicial economy dictates that the Declaratory Judgment Count be heard in the only forum which has jurisdiction over all of the inter-related parties and is thereby best-equipped to render a complete and final adjudication – the State Court, as part of the Board Action.  Thus, the second prong of the "cause" balancing test is satisfied by the Indenture Trustee.

**C.    The Indenture Trustee is Likely to Succeed on the Merits**

62.    The third prong of the "cause" balancing test is satisfied where the movant makes a minimal showing of even a slight probability of success on the merits.  *See, e.g., In re The SCO Group, Inc.*, 395 B.R. 852, 859 (Bankr. D. Del. 2007); *In re Andersen 2000, Inc.*, No. 04-14155, 2006 Bankr. LEXIS 1133 at * 12-13 (Bankr. N.D. Ga. Apr. 24, 2006) (modifying the automatic stay to permit a negligence action to proceed, in part, because debtor's primary defense against the movant in the state court action was "at least jeopardized" by the movant's position).

63.    By the facts asserted herein and in the Counterclaims, the Indenture Trustee demonstrates a sufficient probability that it will ultimately prevail on the causes of action asserted in the Declaratory Judgment Count, including the voidance of the Replacement Note.  Indeed, as described herein, there is no documentary evidence of any kind to support the contention that the Alleged Liability, as memorialized by the Replacement Note, was contemplated at the time of Shingle Creek's acquisition of the Common Area Property in 2005.  Contemporaneous documents, including the Indentures, the Offering Statement, the applicable Financial Statements, Board resolutions and minutes, all fail to memorialize any agreement to incur the Alleged Liability.  Indeed, the Board's authorization of the Replacement Note

apparently rests primarily if not exclusively on the Rubenfeld Affidavit, in which Rubenfeld attests, solely according to his memory, that the Replacement Note is "substantially identical" to an original note memorializing the Alleged Liability supposedly drafted in 2005. Casting further doubt on the veracity of Rubenfeld's distant recollections is the fact that Rubenfeld is Robert Miller's son-in-law.

64.    Indeed, the significant conflicts of interest confronting the Board cast serious doubts upon the validity of the Alleged Liability and the Replacement Note. As described herein, each of the Supervisors is an employee of Robert Miller through Main Street. Robert Miller, however, through a variety of corporate vehicles (including the Debtors), has the ultimate beneficial interest in one hundred percent of the Trust and fifty percent of the other two Landowners. *See* Corporate Chart. Thus, it is ultimately Robert Miller, through the Landowners, that bears the majority of the responsibility to pay the assessments validly imposed by Shingle Creek. The Trust's obligation to pay its assessments, however, might be significantly reduced if the Replacement Note is given force and effect.

65.    Lastly, the Indenture Trustee can readily establish that its bargained-for rights to collect on assessment revenues under the Master Trust Indenture have been breached by Shingle Creek's improper authorization and issuance of the Replacement Note. Sections 501 and 701 of the Master Trust Indenture grant the Indenture Trustee clear legal right to receive the proceeds of bond sales and the assessment revenue to service the Bonds. As the Replacement Note requires that, upon the occurrence of an event of default, principal and interest be paid to the Trust before any payment may be received by the Indenture Trustee, the Board's issuance of the Replacement Note is a clear breach of the Indentures and the Obligations of Shingle Creek.

66.     As a result thereof, the Indenture Trustee demonstrates at least a minimal, if not a significant, probability that it will prevail on the merits in the Declaratory Judgment Count.

## IV.    CONCLUSION

67.     This Court should grant the Motion as significant "cause" exists to modify the automatic stay to allow the Indenture Trustee to pursue the Declaratory Judgment Count as part of the Board Action.  The hardship the Indenture Trustee and the holders of the Bonds will endure if the automatic stay is not modified significantly outweighs any prejudice that may be suffered by the Debtors.   Indeed, the Indenture Trustee's bargained-for rights under the Indentures are in imminent danger as a result of (i) the Board's authorization and issuance of the Replacement Note and (ii) any other unauthorized action the Board may take during the imposition of the automatic stay.  In addition, the interests of judicial economy weigh in favor of allowing the State Court to preside over the Declaratory Judgment Count as part of the Board Action.  The State Court (i) is already familiar with the complex issues and web of inter-related corporate entities at the core of the Board Action as a result of the Foreclosure Action; (ii) has jurisdiction over all of the non-debtor Defendants; and (iii) is ideally suited to analyze and interpret the state statutes implicated by the Declaratory Judgment Count.  Lastly, the Indenture Trustee demonstrates at least a slight (if not significant) probability of success on the merits in the Declaratory Judgment Count.


- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

WHEREFORE, for the reasons set forth herein, the Indenture Trustee respectfully requests that this Court (i) enter an order approving the Motion and modifying the automatic stay, to the extent necessary, to allow the Indenture Trustee to file the Declaratory Judgment Count in the State Court as part of the Board Action; and (ii) grant such other and further relief as this Court deems just and proper.

Dated: February 7, 2011                    Respectfully submitted,

                                           GREENBERG TRAURIG, P.A.
                                           Attorneys for Wells Fargo Bank, N.A.
                                           333 Avenue of the Americas, Suite 4400
                                           Miami, FL 33131
                                           Phone: (305) 579-0500
                                           Fax: (305) 579-0717
                                           Email: huttonj@gtlaw.com


                                           BY: /s/ John B. Hutton_____
                                                    John B. Hutton
                                                 Florida Bar No. 902160
                                                    John R. Dodd
                                                 Florida Bar No. 38091

                                           and-


                                           Steven E. Siff (FBN 352330)
                                           MCDERMOTT WILL & EMERY LLP
                                           201 South Biscayne Boulevard, Suite 2200
                                           Miami, Florida 33131
                                           Tel: 305.358.3500
                                           ssiff@mwe.com

                                           William P. Smith (*pro hac vice* pending)
                                           James W. Kapp III (*pro hac vice* pending)
                                           MCDERMOTT WILL & EMERY LLP
                                           227 West Monroe Street
                                           Chicago, Illinois  60606
                                           Tel: 312.372.2000
                                           wsmith@mwe.com
                                           jkapp@mwe.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List attached to the original hereof, either via transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. mail, postage prepaid, for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ John B. Hutton
JOHN B. HUTTON

## SERVICE LIST

**Electronic Mail Notice List for** Case 10-48790-PGH

The following is the list of parties who are currently on the list to receive e-mail notice/service for this case.

Robert C Furr    bnasralla@furrcohen.com
Alvin S. Goldstein    mmitchell@furrcohen.com
Amy D. Harris    aharris.ecf@srbp.com
John B. Hutton III    huttonj@gtlaw.com,
thompsonc@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com
Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov
Jesse E Summers    jes@rtlaw.com, sguest@rtlaw.com

## Electronic Mail Notice List for Case No. 10-4880-PGH

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- Robert C Furr    bnasralla@furrcohen.com
- Alvin S. Goldstein    mmitchell@furrcohen.com
- John B. Hutton III    huttonj@gtlaw.com,
  thompsonc@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com
- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov

**Manual Service List (see attached)**

DaszkalBolton, LLP
4455 Military Trial, #201
Jupiter, FL 33458

First National Bank,
Pennsylvania
c/o Charles Bartlett, Esq.
2033 Main Street, #600
Sarasota, FL 34236

FM Services, LLC
18753 SE Fedeal Highway
Tequesta, FL 33469

Iberia Bank
7111 Fairway Drive, #201
Palm Beach Gardens, FL 33418

Mellon United National Bank
A.E. "Bud" Osborne, III
1645 Palm Beach Lakes Blvd.
West Palm Beach, FL 33401-2216

Osceola County Tax Collector
2501 E Irlo Bronson Mem. Highway
Kissimmee, FL 34744

Shingle Creek Community Dev. District
c/o Rizzetta & Co., Inc.
Collection Agency
3434 Colwell Avenue, #200
Tampa, FL 33614

South Florida Water Management
District
P.O. Box 24680
West Palm Beach, FL 33416-4680

TLCP, LLC
18753 SE Federal Highway
Tequesta, FL 33469

Welbro Building Corp.
2301 Maitland Center Parkway
#250
Maitland, FL 32751

Kirk Services, LLC
4650 W. Osceola Parkway
Kissimmee, FL 234746

Shingle Creek Community Development
District
c/o Gerald L. Knight, Esq.
Billing, Cochra, Lyles, et al.
515 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301

Osceola Trace Development
18753 SE Federal Highway
Tequesta, FL 33469-1719

Osceola Development Project, LP
18753 SE Federal Highway
Tequesta, FL 33469-1719

Office of the United States Trustee
51 N.W. First Avenue
Suite 1204
Miami, FL 33130-1614

Robert C. Furr, Esq.
2255 Glades Road, #337W
Boca Raton, FL 33431-7379

U.S. Home Corporation
101 Southhall Lane, #200
Maitland, FL 32751-7490

Iberia Bank
c/o J. Ellsworth Summer, Jr., Esq.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207

Welbro Building Corporation
c/o Alvin F. Benton
Holland & Knight LLP
200 S. Orange Avenue, Suite 2600
Orlando, FL 32801-3453

Department of Revenue
Bankruptcy Section
P.O. Box 6668
Tallahassee, FL 32314-6668

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

Alvin S. Goldstein, Esq.
2255 Glades Road, #337W
Boca Raton, FL 33431-7379

Robert L. Miller
18753 S.E. Federal Highway
Tequesta, FL 33469

Alvin F. Benton
200 S. Orange Avenue, #2600
Orlando, FL 32801