UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                          Case No.  10-48790-PGH
                                                Chapter 11
OSCEOLA TRACE DEVELOPMENT                       Jointly Administered
CORPORATION,

            Debtor.
_____/
OSCEOLA DEVELOPMENT PROJECT,                    Case No. 10-48806-PGH
LP,

            Debtor.
_____/
OSCEOLA TRACE VENTURE II, LLC,

            Debtor.                             Case No. 11-13325-PGH

_____/


**<u>DEBTORS' JOINT DISCLOSURE STATEMENT</u>**


FURR AND COHEN, P.A.
Attorneys for Debtors
By:  Robert C. Furr, Esquire
By:  Alvin S. Goldstein, Esquire
2255 Glades Road
One Boca Place, Suite 337W
Boca Raton, Florida 33431
(561) 395-0500
(561)338-7532 fax
E-Mail: rfurr@furrcohen.com

## TABLE OF CONTENTS

**ARTICLE I  DEFINITIONS** ................................................................3

**ARTICLE II  PRELIMINARY STATEMENT AND HISTORY AND FINANCIAL
CONDITION OF DEBTOR** ....................................................3
    (1) HISTORY OF DEBTOR ................................................3
    (2) SUMMARY OF REASONS FOR FILING PETITION...........................6
    (3) SOURCE OF FINANCIAL INFORMATION ...............................6

**ARTICLE III  DEBTOR'S OPERATION AND STRUCTURE**...........................7
    (1) SYNOPSIS OF OPERATION IN CHAPTER 11..............................7
    (2) EXECUTORY CONTRACTS...........................................7
    (3) OBJECTIONS TO CLAIMS AND PREFERENCE ANALYSIS....................8
    (4) OFFICERS AND DIRECTORS.........................................8

**ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS UNDER
THE PLAN** .........................................................9

**ARTICLE V  CLAIMANTS AND IMPAIRED INTEREST HOLDERS**...........14

**ARTICLE VI  ANALYSIS OF THE PLAN VS. LIQUIDATION ANALYSIS** ..........15

**ARTICLE VII  RISK ANALYSIS** .........................................16

**ARTICLE VIII  TAX IMPLICATIONS OF THE PLAN** .........................17

**ARTICLE IX  POST-CONFIRMATION REORGANIZED DEBTOR'S STRUCTURE**...17

**ARTICLE X  CONFIRMATION BY CRAM DOWN**............................17

**ARTICLE XI  MISCELLANEOUS PROVISIONS**............................18

**ARTICLE XII  CONCLUSION** .........................................19

## <u>DEBTORS' JOINT DISCLOSURE STATEMENT</u>

The Debtors, OSCEOLA TRACE DEVELOPMENT CORPORATION ("OTD"), OSCEOLA DEVELOPMENT PROJECT, LP ("ODP") and OSCEOLA TRACE VENTURE II, LLC ("OTV") (OTD, ODP and OTV are collectively referred to herein as the "Debtors"), provide this Joint Disclosure Statement to all known creditors of the Debtors in order to disclose the information deemed to be material, important, and necessary for creditors to arrive at a reasonably informed decision in exercising their right to abstain from voting or to vote for acceptance or rejection of the Debtors' Plan of Reorganization (hereinafter "the Plan").  A copy of the Plan accompanies this Disclosure Statement.

The Court has set a hearing on confirmation of the Plan for _____ at _____, at the Flagler Waterview Building, 1717 North Flagler Drive, Room 870, Courtroom B, West Palm Beach, Florida  33401.  Creditors may vote on the Plan by filling out and mailing the accompanying ballot form to the Bankruptcy Court.  Your ballot must be filed on or before _____.  As a creditor, your vote is important.  In order for the Plan to be deemed accepted, of the ballots cast, creditors that hold as least 2/3 in amount and more than 1/2 in number of the allowed claims of impaired Classes must accept the Plan.  However, you are advised that the Debtors may be afforded the right under the Bankruptcy Code to have the Plan confirmed over the objections of dissenting creditors consistent with the limitations set forth in the Bankruptcy Code.

NO REPRESENTATIONS CONCERNING THE DEBTORS (PARTICULARLY AS TO THEIR FUTURE BUSINESS OPERATIONS OR THE VALUE OF THEIR PROPERTIES), ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO

-1-

SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE UNITED STATES TRUSTEE FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

OTD and ODP filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. 101 et seq., (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on December 23, 2010.   OTV filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on February 8, 2011. The Debtors have continued to operate their businesses as Debtors-In-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

You are urged to carefully read the contents of this Disclosure Statement before making your decision to accept or reject the Plan.   Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they presently exist.   The terms used herein have the same meaning as in the Plan unless the context hereof requires otherwise.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTORS' MANAGEMENT, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.   NO REPRESENTATIONS, OTHER THAN THOSE SET FORTH HEREIN, CONCERNING THE DEBTORS, (PARTICULARLY AS TO FUTURE BUSINESS OPERATIONS OR THE VALUE OF THEIR PROPERTIES), ARE AUTORIZED BY THE DEBTORS.

Projections of results of future operations are based on the Debtors' best estimates in light of current market conditions, past experience, analysis of general economic conditions, and other estimates which will bear on the results.

## ARTICLE I

## DEFINITIONS

The Definitions set forth in Article I of the Plan are incorporated herein.

## ARTICLE II
## PRELIMINARY STATEMENT AND
## HISTORY AND FINANCIAL CONDITION OF DEBTOR

### (1) HISTORY OF DEBTOR

On January 5, 1998, Osceola Development Project, LP completed acquisition of approximately 1,000 acres of land known as Osceola Trace.  The Debtor, Osceola Trace Development Corporation, is the General Partner of Osceola Development Project, L.P.  The Debtor, Osceola Trace Venture II, LLC, is a member partner of Osceola Trace, LLC, a landowner within Osceola Trace.  The partnership immediately enacted a plan to promote the site into one of the largest commercial real estate development projects in North America, to be known as World Expo Park.  It was anticipated that development of World Expo Park would transform over 1,000 acres in Osceola County, Florida into a state-of-the-art venue for the top 500 trade/consumer shows and in excess of 6,000 corporate meeting events held each year.  World Expo Park is strategically located three miles from Walt Disney World and twenty minutes from the Orlando International Airport. The site plan included the development of the following:

- ♦ 3.6 million sq. ft. World Expo Center
- ♦ 1.2 million sq. ft. of office space
- ♦ million sq. ft. of retail space

–3–

- ♦ 9,000 hotel rooms
- ♦ 868 time share units
- ♦ championship golf courses
- ♦ 50 acre lake for recreational vehicles and boat show displays
- ♦ structured and surface parking for 14,000 cars.

The viability and attractiveness of the World Expo Park concept was confirmed by studies conducted by C.H. Johnson Consulting, Inc., experts in convention, sport and real estate consulting. Furthermore, several prestigious consulting firms independently analyzed the tradeshow market and confirmed the demand for the World Expo Center.

In anticipation of the necessary governmental support, the partnership proceeded to lobby for and ultimately achieved a monumental incentive package from Osceola County including the following:

- ♦ $40 Million Osceola County Convention Center on Site
  This building was to be paid for by county bonds and a management contract was to be given to Hilton for management of the Convention Center.

- ♦ $100 Million in Infrastructure
  The original plan was for a quasi-governmental arm of Osceola Trace to issue bonds as a development district. Due to the unexpected and severe obstacles of the bond validation process, Osceola Trace worked with the County on an alternative method whereby the County issued the bonds directly.

- ♦ $5 Million / year (approx.) Marketing Fund
  A portion of sales taxes raised by the impact of the project on hotel throughout the county.

As the home of the Osceola County Convention Center and the World Expo Center, the site has potential to become an internationally renowned business-to-business campus. Application for the Development Order allowing the partnership to achieve the proper zoning for the project and the development rights to mitigate against environmental aspects of the concentrated land use of the property, required special handling. A special arm of the Governor's office fast-tracked the process

for the approval of the development order.  The approved development order was recorded on May 5, 1999.

The World Expo Park build out was to have occurred over three phases.  Phase One of the development plan included:

- The World Expo Center – 1,200,000-square-foot exposition facility which would then be modularly expanded in Phases II and III for a total of 2.4 mm-square-feet
- The Osceola County Convention Center - 143,000-square-foot convention facility, including a 75,000 square foot ballroom, the largest in North America
- A 1,200 room hotel connected directly to the exposition center and the entertainment/retail complex
- A 250,000 - 350,000 square foot entertainment/retail complex housing entertainment venues, specialty retailers, and restaurants
- 1 Championship 18-hole golf course
- 250,000 – 350,000 square feet of premier class A office space
- Structured and surface parking
- 600 - 800 timeshare units
- 600 - 800 multi-family housing units
- Healthcare / Public Safety Complex
- Central Energy Plant.

The centerpiece and catalyst for the project was construction of the 1.2 Million square foot World Expo Center.  The facility was to contain over 860,000 square feet of contiguous open exhibition space to house national and regional trade and consumer shows.  There was enthusiastic interest by several of the premier for-profit trade show operating companies to become a part of the World Expo Center.  The Debtors expected to be able to finance construction for the building by securing guarantees for exhibit space from these trade show operators.

The Shingle Creek Community Development District issued Bond Anticipation Notes (BANs) in 2005.  Proceeds of the BANs were used to partially pay for the purchase of property in the amount of $44,000,000.00 to the Community Development District and to fund minor improvements

on the property purchased.  The Debtor took back a Note in the amount of $22,289,677.00 as an account receivable for the remaining purchase price owed to the Debtor.

The Shingle Creek Community Development issued Bonds in 2006 in the approximate principal amount of $84,600,000.00.  The Bond proceeds were used to pay off the BANs and to fund additional significant improvements to the Shingle Creek Community Development District Property.

The Shingle Creek Community Development District put in $33 million of external infrastructure (roads, utilities, landscaping), and the remaining approximately $23,000,000.00 was being held back by the Indenture Trustee, U.S. Bank, N.A.  Wells Fargo Bank, N.A. has succeeded U.S. Bank, N.A. as Indenture Trustee.  There is litigation pending in Circuit Court involving default on the Bonds, default by the Indenture Trustee in failing to fund improvements in the amount of $23,000,000.00 and the note receivable in the amount of $22,289,677.00 due to the Debtor by Shingle Creek Community Development District.

The Debtors do not provide any retirement benefits.

### (2)  SUMMARY OF REASONS FOR FILING PETITION

Due to the downturn in the real estate market and the recession, the Debtors were unable to develop the project as contemplated above.  Assessment debt and tax arrearages began to mount.  Several lenders declared their obligations in default and commenced litigation.  The Debtors had inadequate resources to cure defaults and pay on-going operating expenses.

### (3)  SOURCE OF FINANCIAL INFORMATION

The source of financial information for this Disclosure Statement and Plan is from reports from Debtors' officers, Debtor-In-Possession Reports, and the Debtors' accountants.  It has not been audited.

## ARTICLE III

## DEBTORS' OPERATION AND STRUCTURE

(1)  SYNOPSIS OF OPERATION IN CHAPTER 11

The Debtors, OSCEOLA TRACE DEVELOPMENT CORPORATION and OSCEOLA DEVELOPMENT PROJECT, LP, have filed their Schedules and Statement of Financial Affairs. These two Debtors have attended the Initial Debtor Interview with the Office of the United States Trustee and the §341 meeting of creditors.  The Debtors are in full compliance with all requirements under the Bankruptcy Code.  The cases of these two Debtors are being jointly administered pursuant to order of this Court dated December 28, 2010, D.E. #14 in Case No. 10-48790-PGH.

The Debtor, OSCEOLA TRACE VENTURE II, LLC, has filed its Schedules and Statement of Financial Affairs and has filed a Motion for Joint Administration with the other two cases.

On or about February 8, 2011, Wells Fargo Bank, N.A. filed its Motion For Relief From the Automatic Stay Pursuant to Section 362(D)(1) of the Bankruptcy Code to Pursue Declaratory Judgment as to Note [D.E. #29].

(2)  EXECUTORY CONTRACTS

Article VI of the Plan entitled "Executory Contracts" indicates that all Executory Contracts and unexpired leases of the Debtors not expressly assumed prior to the confirmation date, or are not at the confirmation date the subject of a pending application to assume, shall be deemed to be rejected.

The Debtors will assume the Billboard Development Agreement, dated May 23, 2005, with Outlook Media, LLC.

–7–

The Debtors will also assume the Osceola Amended and Restated Development Order, Osceola Trace, recorded in Official Record Book 2703, Page 356 of the Public Records of Osceola County, Florida. The only significant obligation of the Debtors under this agreement is the construction of a road. In accordance with the terms of the agreement, the road will be constructed after the last building permit is pulled in Phase I.

### (3) OBJECTIONS TO CLAIMS AND PREFERENCE ANALYSIS

Pursuant to the Plan, the Debtors may object to any scheduled claim or Proof of Claim filed against the Debtors. Such an objection shall preclude the consideration of any claims as "allowed" for the purposes of timely distribution in accordance with the Plan. There are no preferences or voidable transfers which the Debtors can pursue.

The Claims Bar date expires on May 3, 2011. It is anticipated that the Debtors will analyze the claims filed and file objections to certain claims.

One day prior to the filing of the ODP and OTD bankruptcy cases, IberiaBank set off $1,400,000 in an account being held in the name of ODP against the ODP's obligations to Iberia Bank. The Debtors are analyzing and evaluating the viability of an avoidance action as a result of the set-off.

### (4) OFFICERS AND DIRECTORS

The following individuals shall hold the position indicated as an office of the Reorganized Debtors, at the compensation stated, subject to change by action of the Board of Directors. They are insiders.

| President: | Robert L. Miller | No salary or benefits |
| Vice President: | Christopher Austin | No salary or benefits |

## ARTICLE IV

### Treatment of Claims and Interests Under the Plan

4.1   General.  All payments under this Plan shall commence ten days after confirmation unless otherwise provided in the Plan.

4.2   Administrative Claims.  All Allowed Administrative Claims shall be paid:

(a)  in full on the Effective Date or, if such Claim is objected to, the Date of a Final Order allowing any such Administrative Claim;

OR

(b)  upon such other terms as may be agreed to between the Debtors and each such Administrative Claimant.

All case related payments for services, costs, and expenses will be subject to Court approval.  All payments shall be from the Debtors' on-going operations or from an affiliate of the Debtors.

4.3  All fees due under 11 U.S.C. § 1129(a)(12) shall be paid as required by 28 U.S.C. § 1930.

4.4   Tax Claims.  - Allowed Tax Claims specified in 11 U.S.C. Section 507(a)(8) to the extend due and not otherwise paid, shall be paid in full on the Effective Date.

**Osceola Development Project, LP**

4.5   Class 1 consists of the Secured Tax Claims of Osceola County Tax Collector, which are secured by the Debtor's real property.

Class 1-A are the real property taxes for 2009 and 2010 in the amount of $8,748.39 on the Bronson Parcel (as defined in Section 4.7 hereof).  The real property securing this claim will

be returned to Iberia Bank pursuant to Section 3.7 of the Plan. The real property will be returned subject to the outstanding real property taxes.

Class 1-B are the real property taxes for 2009 in the amount of $80,337.01 on the Welbro Parcel (as defined in Section 4.10 hereof). The real property securing this claim will be retained by the Debtor and the holder of this claim shall receive the full amount of the claim paid in regular equal quarterly payments in cash, commencing on the Effective Date, with a final payment due five years after the date of the order for relief.

Class 1-C are the real property taxes for 2009 in the amount of $13,690.06 on the FNB Parcel (as defined in Section 4.6 hereof). The real property securing this claim will be returned to First National pursuant to Section 3.6 of the Plan. The real property will be returned subject to the outstanding real property taxes.

Class 1-D are the real property taxes for 2009 and 2010 on the TLCP Parcel (as defined in Section 3.9 hereof), in the amounts of $47,385.09 and $41.82 respectively. The real property securing this claim will be returned to TLCP, LLC pursuant to Section 3.9 of the Plan. The real property will be returned subject to the outstanding real property taxes.

Class 1-E are the real property taxes for 2009 and 2010 on the Debtors' 61 acres of real property on Osceola Parkway NW in the amount of $30,118.79 and $13,797.26 respectively. The holder of this claim will receive the full amount of the claim paid in regular equal quarterly payments in cash commencing on the Effective Date, with a final payment due five years after the date of the order for relief.

Class 1-F are the real property taxes for 2009 and 2010 in the amount of $61,270.57 and $26,642.05, respectively, on the Shingle Creek Property (as defined in Section 4.11 hereof). The real property securing this claim will be returned to the Shingle Creek

Development District pursuant to Section 3.11 of the Plan.  The real property will be returned subject to the outstanding real property taxes.

4.6    Class 2 is the Allowed Secured Claim of First National Bank of Pennsylvania ("First National"), which is secured by a validly perfected, first priority mortgage lien on the Debtors' 82 acres of real property on Osceola Parkway NE, Osceola County, Florida (the "FNB Parcel"). In full satisfaction of any and all claims against the estates, the Debtor will return the real property securing this claim to the claimant.  The real property securing this claim and which will be returned to the claimant has a value of $16,000,000, which is in excess of the amount due to the claimant and will, therefore, constitute payment in full of the claim.  The claimant will receive no other distribution from the estates.

4.7    Class 3 is the Allowed Secured Claim of Iberia Bank ("Iberia"), which is secured by a validly perfected, first priority mortgage lien on the Debtors' 600 acres of real property (the "Bronson Parcel") in Osceola County, Florida.  In full satisfaction of any and all claims against the estates, the Debtor will return the real property securing this claim to the claimant.  The real property securing this claim and which will be returned to the claimant has a value of $28,000,000, which is in excess of the amount due to the claimant and will, therefore, constitute payment in full of the claim.   The claimant will receive no other distribution from the estates. The claimant will have no further right, title or interest in the IberiaBank Commercial Checking account with an approximate balance of $600,000 and such funds will be turned over to the Debtors.

4.8    Class 4  is the Allowed Secured Claim of South Florida Water Management District ("SFWMD"), which is secured by a Certificate of Deposit with Branch Banking & Trust ("BB&T"), Account #0012.  These obligations and the security therefore shall remain in full

force and effect in accordance with the terms of the documents establishing such obligations and security.

4.9  Class 5 is the Allowed Secured Claim of TLCP, LLC ("TLCP"), which is secured by a validly perfected, first priority mortgage lien on the Debtors' 82 acres of real property in Osceola County, Florida (the "TLCP Parcel"). In full satisfaction of any and all claims against the estates, the Debtor will return the real property securing this claim to the claimant. The real property securing this claim and which will be returned to the claimant has a value of $16,000,000, which is in excess of the amount due to the claimant and will, therefore, constitute payment in full of the claim. The claimant will receive no other distribution from the estates.

4.10  Class 6 is the Allowed Secured Claim of Welbro Building Corp. ("Welbro"), which is secured by a validly perfected, first priority mortgage lien on the Debtors' real property on Osceola Parkway SE, Osceola County, Florida (the "Welbro Parcel"). This obligation and the security therefore shall remain in full force and effect in accordance with the terms of the documents establishing such obligation and security. The Debtors or an affiliate of the Debtors shall make the required payments to the claimant.

4.11  Class 7 is the Allowed Secured Claim of the Shingle Creek Development District, which is secured as a result of an assessment and levy on the Debtor's real property on Osceola Parkway, SE, Osceola County, Florida (the "Shingle Creek Property"). In full satisfaction of any and all claims against the estates, the Debtors will return to the claimant the real property securing this claim. The real property securing this claim and which will be returned to the claimant has a value of $42,400,000, which is in excess of the amount due to the claimant and will, therefore, constitute payment in full of the claim. The claimant will receive no other distribution from the estates. The claimant will have no further right, title or interest in the

receivable of approximately $22,300,000 due to the Debtors from the claimant and these funds shall be turned over to the Debtors.

4.12  Class 8 claims are the Allowed Claims of General Unsecured Creditors of Osceola Development Project, LP.  To the extent not otherwise provided for herein, the holders of Allowed General Unsecured Claims of Osceola Development Project, LP shall receive the full amount of their claim paid over five years in equal quarterly installments, commencing on the Effective Date.

**Osceola Trace Development Corporation**

4.13  Class 9 claims are the Allowed Claims of General Unsecured Creditors of Osceola Trace Development Corporation.  To the extent not otherwise provided for herein, the holders of Allowed General Unsecured Claims of Osceola Trace Development Corporation shall receive the full amount of their claim paid over five years in equal quarterly installments, commencing on the Effective Date.

**Osceola Trace Venture II, LLC**

4.14  Class 10 claims are the Allowed Claims of the General Unsecured Creditor of Osceola Trace Venture II, LLC.  This Debtor will object to the claim of this creditor because it believes it has a right of set-off.  If this Debtor is successful in its claim objection, the claim will be eliminated.  If it is not successful in its claim objection, the Debtor will turn over its interest in Osceola Trace, LLC to this creditor.

4.15  Payment of U.S. Trustee's Fees:  Notwithstanding any other provisions of the Plan to the contrary, the Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the entry of the order confirming this Plan, for pre-confirmation periods and simultaneously provide to the United States Trustee an

appropriate affidavit indicating the cash disbursements for the relevant period. The Debtors, as reorganized Debtors, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6), until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another Chapter under the United States Bankruptcy Code, and the reorganized Debtors shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements from the relevant period.

## ARTICLE V

## CLAIMANTS AND IMPAIRED INTEREST HOLDERS

Claimants and Interest Holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court. According to the Debtors' Plan, Classes 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10 are "impaired" classes within the meaning of §1124 of the Bankruptcy Code. These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a cram down. A Claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding acceptance or rejection of the Plan.

A ballot to be completed by the holders of Claims and/or Interests is included herewith. Instructions for completing and returning the ballots are set forth thereon and should be reviewed at length. The Plan will be confirmed by the Bankruptcy Court and made binding upon all Claimants and Interest holders if (a) with respect to impaired Classes of Claimants, the Plan is accepted by holders of two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in each such class voting upon the Plan, and (b) with respect to classes of Interest

Holders, if the Plan is accepted by the holders of at least two-thirds (2/3) in amount of the allowed interests of such class held by holders of such interests.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may, nevertheless, confirm the Plan if it finds that the Plan accords fair and equitable treatment to any class rejecting it.  Your attention is directed to Section 1129 of the Bankruptcy Code for details regarding the circumstances of such "cram down" provisions.

**ARTICLE VI**

**ANALYSIS OF THE PLAN VS. LIQUIDATION ANALYSIS**

All payments as provided for the in the Debtors' Plan shall be made from available funds of the Debtors or from an affiliate of the Debtors.

The Debtors have filed their monthly operating statements since the filing of the bankruptcy petition.

Attached hereto marked Exhibit "A" is a table showing all of the claims of Debtors in each classification.

Management believes that its Plan of Reorganization provides full value for all claims of creditors and is in the best interest of creditors.

As with any Plan, an alternative would be a conversion of the Chapter 11 case to a Chapter 7 case and subsequent liquidation of the Debtors by a duly appointed or elected trustee. In the event of a liquidation under Chapter 7, the following is likely to occur:

(a) An additional tier of administrative expenses entitled to priority over general unsecured claims under § 507(a)(1) of the Bankruptcy Code would be incurred.  Such administrative expenses would include trustee's commissions and fees to the trustee's

–15–

accountants, attorneys and other professionals likely to be retained by him for the purposes of liquidating the assets of the Debtors;

(b)  Substantially less than market value will be realized for the Debtors' accounts receivable, inventory, equipment, materials and supplies;

(c)  Further claims would be asserted against the Debtors with respect to such matters as income and other taxes associated with the sale of the assets, and the inability of the Debtors to fulfill outstanding, contractual commitments and other related claims.

(d)  A liquidation analysis containing a balance sheet is attached as Exhibit "B".

Predicated upon the foregoing, it is management's opinion that the liquidation value of the Debtors would be insufficient to make any payment to unsecured creditors other than the secured creditors, leaving no monies available for the claims of any other classes of creditors such as general unsecured creditors.

The Court has previously set May 3, 2011 as a claims bar date.  All indebtedness scheduled by the Debtors as not disputed, contingent or unliquidated or any indebtedness set forth in a properly executed and filed Proof of Claim shall be deemed an Allowed Claim unless the same is objected to, and the objection thereto is sustained by the Court.


**ARTICLE VII**

**RISK ANALYSIS**

The Debtors believe there is minimal risk to the creditors if the Plan is confirmed.  There are few hard assets which could be dissipated.  The on-going operation of the business will generate the most funds for payment to creditors.  In the event of liquidation, there will be a

substantial delay as properties are liquidated and, based upon the liquidation analysis attached hereto, it is highly unlikely any funds would remain for distribution to unsecured creditors.

## ARTICLE VIII

## TAX IMPLICATIONS OF THE PLAN

The Debtors believe that confirmation of the Plan will not have any adverse tax implications for the estates. The Debtors strongly urge that each creditor consult with its own tax advisor regarding the federal, state, local and other tax consequences which the implementation of the Plan will have on them.

## ARTICLE IX

## POST-CONFIRMATION REORGANIZED DEBTORS' STRUCTURE

Upon the Effective Date, the Debtors shall retain all of their assets and continue to operate their businesses.

## ARTICLE X

## CONFIRMATION BY CRAM DOWN

The Debtors reserve the right, in the event that impaired classes reject the Plan, to seek confirmation of the Plan if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting class.

The Plan is deemed fair and equitable if it provides (i) that each holder of a Secured Claim retains its lien and receives deferred cash payments totaling at least the allowed amount of its claim, of a value, as of the effective date of the Plan, of at least the value of its secured

interest in the property subject to its lien, and (ii) that each holder of an unsecured claim receives property of a value equal to the allowed amount of its claim, or no holder of a junior claim receives or retains any property.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

A.  Notwithstanding any other provisions of the Plan, any claim which is scheduled as disputed, contingent, or unliquidated or which is objected to in whole or in part on or before the date for distribution on account of such claim shall not be paid in accordance with the provisions of the Plan until such claim has become an Allowed Claim by a final Order.  If allowed, the claim shall be paid on the same terms as if there had been no dispute.

B.  At any time before the Confirmation Date, the Debtors may modify the Plan, but may not modify the Plan so that the Plan, as modified, fails to meet the requirements of §1122 and §1123 of the Bankruptcy Code.  After the Debtors file a modification with the Bankruptcy Court, the Plan, as modified, shall become the Amended Plan.

C.  At any time after the Confirmation Date, and before substantial consummation of the Plan, the Debtors may modify the Plan with permission of the Court so that the Plan, as modified, meets the requirements of §1122 and §1123 of the Bankruptcy Code.  The Plan, as modified under this paragraph, shall become the Amended Plan.

D.  After the Confirmation Date, the Debtors may, with approval of the Bankruptcy Court, and so long as it does not materially and adversely affect the interest of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

## ARTICLE XII

## CONCLUSION

Under the Plan, all creditors and interest holders of Debtors will participate in some manner in the distribution to be made thereunder. The Debtors believe that the distributions contemplated in their Plan are fair and afford all Claimants and interest holders equitable treatment. ACCORDINGLY, THE DEBTORS RECOMMEND THAT ALL CLAIMANTS AND INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.

DATED: February __9__, 2011.

OSCEOLA TRACE DEVELOPMENT CORPORATION

By: _____
    Robert L. Miller, President

OSCEOLA DEVELOPMENT PROJECT, LP
By: OSCEOLA TRACE DEVELOPMENT
CORPORATION, its General Partner

By: _____
    Robert L. Miller, President

OSCEOLA TRACE VENTURE II, LLC

By: _____
    Robert L. Miller, President

-19-

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

FURR AND COHEN, P.A.
Attorneys for Debtor
2255 Glades Road
One Boca Place, Suite 337W
Boca Raton, FL  33431
561-395-0500
561-338-7632 fax

By _____
ROBERT C. FURR
Florida Bar No. 210854
E-mail: rfurr@furrcohen.com
ALVIN S. GOLDSTEIN
Florida Bar No. 993621
E-mail:  agoldstein@furrcohen.com

## EXHIBIT "A"

### Osceola Development Project, LP

| CLASS | CREDITOR | CLAIM NO. | AMOUNT |
|---|---|---|---|
| 1 | Osceola County Tax Collector | Scheduled | 137,161.73 |
| 2 | First National Bank, Pennsylvania | Scheduled | 13,100,000.00 |
| 3 | Iberia Bank | Scheduled | 20,644,731.24 |
| 4 | South Florida Water Management District | Scheduled | Unknown |
| 5 | TLCP, LLC | Scheduled | 10,100,000.00 |
| 6 | Welbro Building Corp. | Scheduled | 440,000.00 |
| 7 | Shingle Creek Development District | Scheduled | 42,400,000.00 |
| 8 | DaszkalBolton, LLP | Scheduled | Unknown |
| 8 | Kirk Services, LLC | Scheduled | Unknown |
| 8 | Legacy Acquisitions I, LLC | Scheduled | 16,000.00 |
| 8 | Mellon United Bank | Scheduled | 579,000.00 |
| 8 | South Florida Water Management District | Scheduled | Unknown |
|  |  |  |  |

### Osceola Trace Development Corporation

| CLASS | CREDITOR | CLAIM NO. | AMOUNT |
|---|---|---|---|
| 9 | DaszkalBolton, LLP | Scheduled | Unknown |
| 9 | First National Bank, Pennsylvania | Scheduled | 13,000,000.00 |
| 9 | Iberia Bank | Scheduled | 20,644,731.24 |
| 9 | Mellon United National Bank | Scheduled | 0.00 |
| 9 | Osceola County Tax Collector | Scheduled | 137,161.73 |
| 9 | Shingle Creek Community Dev. District | Scheduled | 42,400,000.00 |
| 9 | South Florida Water Management District | Scheduled | Unknown |
| 9 | TLCP, LLC | Scheduled | 10,100,000.00 |
| 9 | Welbro Building Corp. | Scheduled | 550,000.00 |
|  |  |  |  |

### Osceola Trace Venture II, LLC

| CLASS | CREDITOR | CLAIM NO. | AMOUNT |
|---|---|---|---|
| 10 | U.S. Bank, N.A. n/k/a Wells Fargo Bank N.A. | Scheduled | 14,000,000.00 |
|  |  |  |  |

## EXHIBIT "B"

## LIQUIDATION ANALYSIS

| ASSETS: | LIQUIDATION VALUE: |
|---|---|
| Cash in Bank | $      600,000.00 |
| Certificate of Deposit with BB&T | 340,351.78 |
| Accounts Receivable | 22,289,677.00 |
| Bronson Parcel, Osceola County | 28,000,000.00 |
| Osceola Pkwy SE, Osceola County | 4,000,000.00 |
| Osceola Pkwy NE, Osceola County | 16,000,000.00 |
| Osceola Pkwy NW, Osceola County | 16,000,000.00 |
| Osceola Pkwy NW, Osceola County | 13,000,000.00 |
| Property South of Osceola Parkway, Osceola County | 42,400,000.00 |
| | |
| Total Assets | $144,030,178.33 |

| LIABILITIES: | |
|---|---|
| First National Bank of Pennsylvania Mortgage | $ 13,000,000.00 |
| Iberia Bank Mortgage | 20,644,731.24 |
| South Florida Water Management District | Unknown |
| TLCP, LLC, Mortgage | 10,100,000.00 |
| Shingle Creek Community Development District Assessment | 42,400,000.00 |
| Welbro Building Corp. Mortgage | 550,000.00 |
| Unsecured claims of Osceola Trace Development Corporation | 137,161.73 |
| Unsecured claims of Osceola Development Project, L.P. | 579,000.00 |
| Unsecured claim of U.S. Bank, N.A. | 14,000,000.00 |
| | |
| Total Liabilities | $101,410,892.97 |